IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | |
|---|---|
| Genesis Health Care Inc., <br><br> Plaintiff, <br><br> vs. <br><br> Xavier Becerra, as Secretary of the United States Department of Health and Human Services, Carole Johnson, as Administrator of the Health Resources and Services Administration, and Emeka Egwim, as Lieutenant Commander in the United States Public Health Service and Director of the Office of Pharmacy Affairs in the Health Resources and Services Administration, <br><br> Defendants. | Civil Action Number: 4:19-cv-01531-RBH <br><br><br><br> **PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT, IN RESPONSE TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT, AND IN RESPONSE TO *AMICUS* BRIEFS** |

Plaintiff Genesis Health Care, Inc. ("Genesis") hereby respectfully submits this Reply in Support of its Motion for Summary Judgment, in Response to Defendants' Cross-Motion for Summary Judgment, and in Response to Amicus Briefs.

## I.      Introduction

As noted in the Court's Order denying Genesis' Motion to Compel, "the sole issue in this declaratory judgment action concerns the definition of 'patient' in the context of the HRSA's 340B Program, HRSA's patient definition guidelines, and whether HRSA's reading of the term 'patient' is consistent with the statute, 42 U.S.C. § 256b(a)(5)(B)."  Dkt. NO. 98 at p. 2, ¶ 1. The 340B Statute, 42 U.S.C. § 256b(a)(5)(B), states simply that "[w]ith respect to any covered outpatient drug that is subject to an agreement under this subsection, a covered entity shall not resell or otherwise transfer the drug *to a person who is not a patient of the entity*." (emphasis added).

Specifically, Genesis objects to the Health Resources and Services Administration's ("HRSA") embellishment of the statute by which HRSA improperly attempts to amend the term "patient" to add that the patient must *also* be an individual who has had an encounter with a covered entity that resulted in the prescription being filled with 340B priced drugs. Dkt. No. 33-10 at ¶ 2. Contrary to HRSA's position, the clear and unambiguous language of 42 U.S.C. § 256b(a)(5)(B) says nothing about the origin of the prescription being filled by a 340B covered entity, and HRSA's addition of a requirement for the covered entity to have also generated the prescription in question is unlawful and an improper unauthorized amendment of 42 U.S.C. § 256b(a)(5)(B). *See Sanofi Aventis U.S., LLC v. U.S. Dep't of Health & Human Servs.,* 58 F.4th 696, 699 (3d Cir. 2023)(a statutory silence "tempts speech," "[b]ut courts must resist the urge to fill in words that Congress left out.") *Id.*

As noted in previous submissions to this Court and discussed in this Reply, the principles of statutory interpretation support Genesis' position regarding the reading of 42 U.S.C. § 256b(a)(5)(B). Furthermore, Genesis is providing additional support concerning the relevant legislative history in this Reply that sheds light on Congressional intent concerning the applicability and scope of the statute. Significantly, in 1992, Congress *considered and rejected* the very restrictions HRSA is superimposing on the 340B Statute. Before the adoption of the current 340B Statute, Congress considered and did not pass the Public Health Clinic Prudent Pharmaceutical Purchasing Act, the initial version of S. 1729 (discussed and debated in the U.S. Senate) which would have achieved similar goals as the 340B Statute for Federally Qualified Health Centers ("FQHCs") and other grantees. During consideration of S. 1729, Congress *rejected* an amendment which would have prohibited a Covered Entity from "dispens[ing] or administer[ing], directly or through a contract, [a discounted] drug or biological *to an individual*

*who is not receiving the drug or biological as a patient of the covered entity.*" S. Rep. 102-259 at 4 (1992) (1992 WL 44411)(emphasis added)(**Exhibit 1**).  Notably, in the same year Congress rejected such an amendment, Congress passed the 340B Statute and incorporated the current language of 42 U.S.C. § 256b(a)(5)(B)(that a covered entity shall not resell or otherwise transfer the drug to a person who is not a patient of the entity - instead of the rejected, restrictive language of S. 1729, that the patient *must receive the drug as a* patient of the covered entity).

Also, the egislative history surrounding the 340B Statute reflects Congress' intent that the 340B Drug Program was designed to protect FQHC's and other Public Service Clinics ("PSCs") from drug industry cost shifting, as well as price increases imposed on safety net providers by drug manufacturers following implementation of the Medicaid Rebate Program in 1990.  The Omnibus Budget Reconciliation Act ("OBRA") of 1990 created a rebate program wherein drug manufacturers are required to submit rebates on outpatient prescription drugs to the States and Federal government to lower the cost of such drugs to the Medicaid program.  House Report 102-384, Part 2 (**Exhibit 2**).  However, the 1990 drug rebate program led drug manufacturers to significantly raise drug prices negatively impacting the Department of Veterans Affairs and federally funded clinics and public hospitals.  The price increases "reduced the level of services and the number of individuals that these hospitals and clinics are able to provide with the same level of resources.  *Id.*  As noted by Senator Pryor at this time:

> Unfortunately, it is now becoming clear that the industry has, once again, chosen profits over compassion. Rather than reducing their multi-billion dollar profits or marketing and advertising budgets, many manufacturers have apparently chosen to significantly raise prices to other purchasers-including Public Health Service Act clinics.  It is my belief that we cannot allow this type of behavior to stand.

David H. Pryor (AR). "Co-Sponsor S. 1729." *Congressional Record* 137-Part 16 at 23541 (1991) at 23541 (**Exhibit 3**).

3

It is important to note that drug purchases that occur as part of the 340B Drug Program are between *covered entities* and drug manufacturers, not between *pharmacies* and pharmaceutical companies. *See https://www.hhs.gov/guidance/document/340b-drug-pricing-program-frequently-asked-questions* (pharmacies are not eligible for the 340B Program). Section 340B(a)(4) definition of the term "covered entity" includes FQHCs, Ryan White HIV/AIDS Program Grantees, Hospitals, and Specialized Clinics. 42 U.S.C. § 256b(a)(4); https://www.hrsa.gov/opa/eligibility-and-registration. Pharmacies are not in the definition of "covered entity." See also *Pharmaceuticals LP v. Becerra*, 543 F. Supp. 3d 47, 59 (D. Del. 2021).

All of the covered entities function as "safety net" providers, serving low-income and vulnerable patient populations. Health Centers like Genesis "provide affordable, accessible, high-quality primary health care services and additional health services (defined in 42 U.S.C. §254B(A)(1) necessary for the adequate support of primary health care services) to individuals and families" including but not limited to patients "experiencing homelessness, agricultural workers, residents of public housing, and veterans." https://bphc.hrsa.gov/about-health-centers/what-health-center. The pharmacy discounts (ceiling prices of prescription drugs) available through the 340B Program help covered entities provide and expand needed medical services that would otherwise not be available in the communities the covered entities serve. *See* https://hcpsocal.org/340b/#:~:text=The%20340B%20statute%20defines%20the,black%20lung%2C%20etc.). The goal of the 340B Program and Congressional intent is to reduce the high drug prices being charged by drug manufacturers so that covered entities could "stretch federal resources as far as possible, reaching more eligible patients and providing more

comprehensive services." *See* Section 601 and 602 of the Veterans Health Care Act of 1992[1] (Public Law 102-585).

In addition, Congress specifically states in the relevant legislative history that the 340B Program was intended to *protect Americans' access* to needed medications and life-threatening therapies. The Chairman of the Committee on Labor and Human Resources noted that while the pharmaceutical companies deserve a reasonable return on investment, "*there is a line between profits and profiteering.*"  To Amend the Public Health Service Act to Require Drug Manufacturers to Provide Affordable Prices for Drugs Purchased by Certain Entities Funded Under the Public Health Service Act: Hearing Before the Committee on Labor and Human Resources United States Senate, S. Hrg 102-387 at 2)(emphasis added)(**Exhibit 4**).   "*When pricing and policies for prescription drugs threaten access of vast numbers of Americans to needed medications and life-threatening therapies, then Congress must and will step in.*" *Id.* at 2-3 (emphasis added).

The Defendants' attempts to narrow the financial protection for covered entities like Genesis and narrow access of PHS patients to much needed medications and therapies is perplexing given the clear legislative intent behind the enactment of the 340B Program to support FQHC's holistic mission of providing comprehensive healthcare services to vulnerable patients which includes necessary pharmaceutical services that allow patients to comprehensively access prescription drugs.  Accordingly, Genesis respectfully requests that this Court rule in favor of Genesis and enter a declaratory judgment rejecting Defendants' erroneous interpretation of the plain language of 42 U.S.C. § 256b(a)(5)(B). [2]

---

[1] https://www.hrsa.gov/opa/program-requirements/public-law-102-585#60

[2] In addition to these central arguments, Genesis addresses the various other ancillary positions raised by Defendants and Amici in this Reply.

II.   **HRSA's Enforcement of Its Interpretation of the Term "Patient of the Entity" Should Be Rejected in Favor of Plaintiff's Interpretation Which is in Line with Congressional Intent and Principles of Statutory Interpretation**

A.   **HRSA's Framing of the Issue in the Case as "Diversion" is Misplaced Because Pharmaceutical Services *Are Part of* the FQHC Covered Entity**

Defendants' Opposition Brief brings into focus HRSA's contention that Genesis, as a covered entity, is engaging in impermissible "diversion": ". . . the statute imposes a commonsense limitation known as the prohibition on diversion: a covered entity cannot 'resell or otherwise transfer' 340B drugs 'to a person who is not a patient of the entity.'" Dkt. No. 33-10 at 4.  "HRSA continues to stand by its interpretation of the prohibition on diversion."  *Id.* at 5.  However, the straightforward language of the statute states that  "a *covered entity* shall not *resell or otherwise transfer* the drug to a person *who is not a patient of the entity*."  42 U.S.C. § 256b(a)(5)(B)(emphasis added).  Applying this language, Genesis does not "*resell or otherwise transfer*" a 340B drug or act as a drug wholesaler. Instead, Genesis *dispenses* 340B medications to its patients in line with its obligation to provide pharmaceutical services as an FQHC.

Genesis, as a nonprofit FQHC and Health Center Program grantee is required to provide a wide range of healthcare services including patient case management services and pharmaceutical services. 42 U.S.C. §§ 254b(b)(1)(a)(i)(V); 254b(b)(1)(a)(iii).  "Patient case management services" are defined as services "including counseling, referral, and follow-up *services*" and other services *designed to assist health center patients in establishing eligibility for and gaining access to Federal, State, and local programs that provide or financially support the provision of medical, social, housing, educational, or other related services*." 42 U.S.C. §254b(b)(iii) )(emphasis added). Case management services can include transitional care management (medical management of a patient's care and medication needs, including medication management and coordination when a patient is discharged from an institutional setting such as a

hospital or nursing home to a home setting for out-patient care), management of chronic illnesses, general behavioral health integration, and psychiatric collaborate health care services. Thus, case management activities necessarily involve comprehensive care management for patients *outside the office setting*, and *interactions with the patient's other health providers* to coordinate medication and other necessary transitions and services. https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/FQHC-Text-Only-Factsheet.pdf )(emphasis added); *see https://www.ruralhealthinfo.org/care-management/chronic-care-management*.

The straightforward language of 42 U.S.C. § 256b(a)(5)(B) enables Genesis to dispense a 340B drugs to its patients, *thereby giving patients access to discounted medications*, regardless of whether the prescription was directly generated through a visit with a Genesis provider or by another provider. The term "pharmaceutical services" means not only access to medications, but "may include a broad spectrum of functions ranging from the dispensing and tracking of medications to pharmacist-delivered patient care services (e.g., disease state management, medication reconciliation, therapeutic monitoring, wellness promotion, and disease prevention)." *See* https://bphc.hrsa.gov/sites/default/files/bphc/compliance/form-5a-service-descriptors.pdf Generally, the provision of pharmacy services also routinely includes "the functions and activities encompassing the procurement, dispensing, distribution, storage and control of all pharmaceuticals used within the facility, and the monitoring of patient drug therapy. *See* https://www.lawinsider.com/dictionary/pharmaceutical-services. Genesis provides pharmaceutical services through its two in-house pharmacies, three FQHC outlets, and nationally certified specialty pharmacy. Dkt. No. 111-1 at ¶¶ 4-5.

Defendants complain that "Genesis's understanding of the statute would allow it to essentially act as a pharmacy—one with a massive advantage, in that it has access to deeply discounted drugs" and that "Pharmacies qua pharmacies [sic] are not part of the 340B Program." Dkt. No. 33-10 at 23. But Defendants' argument is *blatantly misleading*, because pharmaceutical services *are part of* the FQHC covered entity. *See* 42 U.S.C. 254b The 340B Program is a creation of Congressional authority that allows "*covered entities*" to purchase prescription medications at or below a "maximum ceiling price" (see 42 U.S.C. 256b(a)(1) set by a statutory formula developed by Congress. 42 U.S.C. 256b(a)(2). Covered entities are different than stand-alone pharmacies in that high drug prices impact covered entities holistically - high drug prices are shown to reduce the level of services and the number of individuals that these hospitals and clinics are able to provide with the same level of resources. *See* House Report 102-384 at 11 from 1992, Part 2 at 12 (**Exhibit 2**)(reflecting that the high price increases imposed by pharmaceutical companies had reduced the level of services and number of individuals the hospitals and clinics could provide).

Also key is that an FQHC *dispenses drugs* to the FQHC's patients - it does not resell or transfer drugs.   When drafting 42 U.S.C. § 256b(a)(4), Congress chose to use the words "resell" and "transfer" and not "dispense." Congress used the term "Dispensers" elsewhere in the statute, when discussing certain entity types (J & K) - "(a)(7)(D) List of Purchasers and Dispensers." Congress also used the word "dispense" in section 601, the section of the VA Act that created 340B. Veteran Health Care Act. Public Law 102-585 (1992).  Congress clearly knows what dispensing is and could have used that term, but instead used the terms "resell" and "transfer." Congress chose the verbs in this section carefully to clarify that 340B drugs can only be *dispensed to patients of the entity* and not resold or transferred in any way.  As such, where the prescription

originates *for in-house FQHC pharmacies* does not impact whether the pharmacy was dispensing to patients consistent with statute and program intent (reduction in costs for the covered entity).

There is also a difference between *dispensing* a drug to a patient and *reselling or transferring* a drug. Diversion could occur when a covered entity resells or transfers drugs to another entity that is part of the same health system and the 340B drugs are given to individuals who are not patients of the covered entity. Genesis does not do so. Diversion could also occur when a covered entity gives 340B drugs to an individual who has never received treatment or care from the covered entity. Genesis does not do so. Defendants assert that Genesis engages in this type of diversion, but this is simply not true and there is no evidence to support such as aspersion.[3] Dkt. No. 33-10 at 6. Genesis has policies in place to ensure a patient-provider relationship exists.[4] Dkt. No. 111-1 at ¶ 3. To be considered a patient, an individual must have had a face-to-face encounter with a Genesis provider in the preceding 15 months before any 340B drug is dispensed to the patient. *Id*. This conservative approach falls comfortably within the plain meaning of § 256b(a)(5)(B), as well as the Congressional intent behind (a)(5)(B).[5]

---

[3] It is important to note that HRSA vacated its audit findings that Genesis was in violation of the 340B statute's prohibition on diversion.

[4] Even though HRSA vacated its audit findings, Defendants state that Genesis "did not have patient records" for all requested samples during the audit. Dkt. No. 33-10 at 6. However, as stated in the original audit findings, the auditors were looking at what *they deemed* as "eligible sites" where prescriptions were written and a documented written referral to that prescriber prior to the prescription being written. Therefore, the statement that Genesis was not able to provide medical records for the patients is factually inaccurate. Moreover, any "audit findings" by Defendants during the *voided audit* have no import.

[5] FQHC's are required to provide primary and preventative care to patients, regardless of their ability to pay. https://www.cms.gov/newsroom/fact-sheets/cms-proposes-new-medicare-prospective-payment-system-pps-federally-qualified-health-centers. Therefore, providing a patient with access to affordable medications is an FQHC requirement and is not contingent on where a prescription is generated.

**B.      The Legislative Intent for the 340B Program Is to Protect Covered Entities to Allow Them to "Stretch Scarce Federal Resources as Far as Possible and Provide Access to "Vast Numbers" of Americans to Needed Medications and Therapies**

As recognized in Congressional history, the purpose of the 340B Drug Pricing Program "is to enable the Department of Veterans Affairs and certain Federally-funded clinics to obtain lower prices on the drugs that they provide *to their patients*." H.R. Report 102-384, Part 2 at 7 (1992). (**Exhibit 2**). The 340B legislation was enacted in 1992 as a means to extend to covered entities including FQHCs and other public health service ("PHS") clinics the "much needed financial relief" given to Medicaid in the form of drug price discounts.  Edward M. Kennedy (MA), "Sponsor S. 1729." *Congressional Record* 137-Part 16 (1991) AT 23539. (**Exhibit 3**).

At this time, as noted previously, the pharmaceutical industry was seen as shifting costs to the PHS clinics to offset discounts the drug manufacturers were mandated to provide to Medicaid. Senator Kennedy (MA), Cong. Rec. Vol. 137 Part 16, S23539 at 23539(September 19, 1991)(**Exhibit 3**).   Senator Kennedy stated: "Public Health Service Act clinics have the worst of both worlds.  They are not able to receive the same discount prices as Medicaid payers, and they are now being forced to accept much larger than normal price increases for prescription drugs. Even these normal price increases for drugs have been more than twice the rate of general inflation" Id.

The 340B Program was enacted to extend the Medicaid drug price rebate to the financially-strapped public health programs. *Congressional Record* 137-Part 16 (1991) at 23540 (**Exhibit 3**). In a nutshell, the 340B Program requires drug companies, as a condition of accessing the large Medicaid market, to enter into agreements with the HHS Secretary that set prices that covered entities paid for covered outpatient drugs to an amount equal to the net Medicaid price post-rebate. 42 C.F.R. 10.2.  The goal of the 340B Program was to reduce high drug prices so that the covered

10

entities could "stretch federal resources as far as possible, reaching more eligible patients and providing more comprehensive services." *See* Section 601 and 602 of the Veterans Health Care Act of 1992[6] (Public Law 102-585). "The services provided by these [PHS] clinics are indispensable to poor and underserved Americans."  Edward M. Kennedy (MA), *Congressional Record* 138-Part 23 (1992) at 34312 (**Exhibit 5**). The Chairman of the Committee on Labor and Human Resources stated: "When pricing and policies for prescription drugs threaten access of vast numbers of Americans to needed medications and life-threatening therapies, then Congress must and will step in."  The 340B Program was also intended to protect access of Americans to needed medications and life-threatening therapies. To Amend the Public Health Service Act to Require Drug Manufacturers to Provide Affordable Prices for Drugs Purchased by Certain Entities Funded Under the Public Health Service Act: Hearing Before the Committee on Labor and Human Resources United States Senate, S. Hrg 102-387 at 2-2)(**Exhibit 4**).    With this background, it is clear that the 340B Program is intended provide patient access to lower cost medications and therapies in the broadest sense, regardless of the origin of the prescription.  The Defendants' attempts to narrow the financial protections for PHS entities like Genesis and lessen access of PHS patients to much needed medications and therapies is not simply perplexing in light of this legislative history, but a direct rejection of the will of Congress.

C.     **HRSA's Ad Hoc Amendment of the Language of 42 U.S.C. § 256b(a)(5)(B) Should Be Disallowed Because Legislative History Reflects Congress *Considered and Rejected* the Restrictions and Definition Enforced by HRSA**

The Defendants have lost sight of the fact that the only issue remaining in the case is "the definition of 'patient' in the context of the HRSA's 340B Program, HRSA's patient definition guidelines, and whether HRSA's reading of the term 'patient' is consistent with the statute, 42

---

[6] https://www.hrsa.gov/opa/program-requirements/public-law-102-585#60

U.S.C. § 256b(a)(5)(B)." Dkt. 98 at 9-10. It is not. Defendants instead go to great lengths to pretend to be confused by the simple issue before the Court and complain "Genesis's motion is unfocused and pervasively ambiguous because they use the phrase 'patient of a covered entity' [the language of the statute] when the crux of the dispute is how to interpret the language." Dkt. No. 33-10 at 2. What Defendants really mean is they want to replace the term "patient of a covered entity" with an improperly amended phrase "patient of a covered entity only when the covered entity initiated the healthcare service resulting in the prescription."

Defendants' attempt to unilaterally amend the language of 42 U.S.C. § 256b(a)(5)(B) should be rebuffed. HRSA's proposed definition of "patient" improperly enlarges the plain language of the statute to suggest the term "patient" should be narrowed to only a subset of patients who obtained their prescription directly from a visit at the FQHC. The plain language of 42 U.S.C. § 256b(a)(5)(B) does not support HRSA's interpretation, as, on its face, it only requires the existence of a patient relationship with a FQHC (or any other covered entity).

Although Genesis believes that the statutory text is clear in and of itself, the Court may look to legislative history for confirmation. As referred to previously, before adopting the 340B Statute in 1992, Congress considered numerous prototypes aimed at addressing the same subject, including The Public Health Clinic Prudent Pharmaceutical Purchasing Act, S. 1729, which would have achieved many of the same goals as the 340B Statute for federally qualified health centers and other grantees. The initial version of S. 1729 was more punitive than the 340B Statute is today, prohibiting a covered entity from reselling a discounted drug and imposing a $25,000 civil monetary penalty for each instance of diversion. After its introduction, a congressional committee adopted an amendment which would have prohibited a Covered Entity from "dispens[ing] or administer[ing], directly or through a contract, [a discounted] drug or biological *to an individual*

12

*who is not receiving the drug or biological as a patient of the covered entity.*" S. Rep. 102-259 (1992) (1992 WL 44411 *4) (providing the amended bill text), (1992 WL 44411 *6) (describing the statutory history and amendment in the nature of a substitute)(emphasis added)(**Exhibit 1**). In other words, Congress *rejected* the same language HRSA is overlaying on the current 340B Statute.

Congress's choice *not* to require such a connection is meaningful evidence that the Defendants erred in looking for and requiring Genesis to demonstrate that it prescribed a drug to a person as a condition of determining them to be its "patient."

### D. HRSA's Interpretation of the Term "Patient of the Entity" is Out of Line with Established Rules of Statutory Interpretation

Defendants argue that HRSA's interpretation of the term "patient of the entity" is correct based on grammar canons of statutory interpretation. Dkt. No. 33-10 at 16-19. No so. Defendants state that these standards require a possessive relationship between the patient and the entity, and this construction justifies their interpretation of "patient of the entity" to mean that the covered entity must have "initiated the healthcare service resulting in the prescription." Dkt. No. 33-10 at 17. They also state that is it meaningful that Congress used the present tense when it prohibited covered entities from transferring 340B drugs to a "person who is not a patient of the entity." Dkt. No. 33-10 at 18-19. However, Defendants never identify where Congress used the word "prescription" for the term "patient." The reason for this omission is simple: Congressional history does not contain this concept and evidences the opposite of Defendants' arguments.

When the tools of statutory interpretation cited by Defendants are applied, they are not at odds with the plain meaning of the statute. Genesis does not disagree that individuals receiving 340B medications from Genesis must be patients of Genesis. Genesis' in-house pharmacy dispenses drugs to its patients, and Genesis' policies and operation of its in-house pharmacy and

contract pharmacies comply with 42 U.S.C. § 256b(a)(5)(B) as well as the intent behind the 340B Program.

Genesis is a covered entity FQHC that *dispenses* prescription drugs directly, through pharmacies registered under South Carolina law to its patients that have had a face-to-face encounter with a Genesis provider in the preceding 15 months. Only 3% of Genesis' current patients who qualify for 340B drugs under Genesis' criteria receive their 340B drugs from a contract pharmacy. *See* Dkt. 111-1 at ¶ 4. In addition, the small percentage of Genesis patients who receive their 340B medications from contract pharmacies must have their prescriptions written by a Genesis provider in compliance with Genesis policy that follows the 1996 Contract Pharmacy Guidelines. *See* Dkt. No. 111-1 at ¶ 4. *See also* 61 Fed. Reg. 165, 43549 (August 28, 1996).

Defendants also argue that their interpretation of the term "patient of the entity" is a reasonable and commonsense way to give effect to Congressional intent for the purpose of the 340B Program. Dkt. No. 33-10 at 18, 20 and 25. However, as noted in Section II.C., Congress specifically *rejected* the exact language HRSA has adopted requiring a covered entity's patient to have obtained the prescription from the covered entity. Genesis does not receive additional revenue from *dispensing* 340B drugs. Instead, the 340B Program lowers the cost of prescription drugs for covered entities. As discussed previously, the purpose of the 340B Program was *not* to restrict prescription eligibility for patients of FQHCs and other covered entities. It was intended to *enhance* patient access. This goal is stated on HRSA's own website: "*The 340B Program enables covered entities to stretch scarce federal resources* as far as possible, reaching more eligible patients and providing more comprehensive services." 340B Drug Pricing Program | HRSA. Congressional history and the 340B Program background lends support to the definition

of the term patient being viewed as simply *patients of* the covered entity, without the additional language HRSA seeks to append to the statue (that the prescription has to originate from the Covered Entity, language rejected by Congress).

### E.     Defendants' Improper Bid to Fill Out a Statutory Void Should Be Rejected

Defendants argue that the *Sanofi* case is not relevant to the issue at hand. Genesis disagrees and reasserts the argument made in Genesis Motion for Summary Judgment regarding the *Sanofi* case. Dkt. No. 33-10 at 25-26; Dkt. No. 100 at 16-17. The fact that Genesis provides pharmacy services and the *Sanofi* case involved a covered entity's use of contract pharmacies does not matter. The holding of *Sanofi* applies to the statutory interpretation of the 340B Statute which is the heart of the matter. The *Sanofi* court held that HHS and HRSA cannot "fill statutory voids" in the 340B Statute where there is nothing in the plain text of the statute or legislative history to support their interpretation. "Statutory silences, like awkward silences, tempt speech. But courts must resist the urge to fill in words that Congress left out." *Sanofi* at 699.

Defendants argue that they are not attempting to fill a statutory silence because Congressional intent is clear that HHS and HRSA are tasked with effectuating the prohibition on diversion and argue that when Congress amended the 340B Statute in 2010, Congress was aware of HRSA's interpretation of the statute, but did not disturb HRSA's interpretation. However, Defendants fail to add that *Congress did not incorporate HRSA's interpretation into the statute and Section (a)(5)(B) remained unchanged after the 2010 Amendment.* If the purpose of the amendment was to strengthen HRSA's oversight of covered entities like Genesis from dispensing to its patients that do not have prescriptions initiated by the covered entity, Congress could have added a definition for the term "patient" in the statute that included that requirement or added that

requirement to Section (a)(5)(B).  Congress did not do so.[7]  Instead, Congress left the statutory language as-is, reflecting Congress' earlier rejection of HRSA's restrictive definition.  *See* Section II.C. HRSA has no authority whatsoever to override the intent of Congress.  The *Sanofi* case reinforces that HRSA has no authority to attempt to fill what it perceives as missing language in the statute.

### III. Defendants' Claim that Genesis is "Only Challenging Language Contained in the Audit Determination" Is Meritless and Contrary to Genesis' Unequivocal Stated Challenges to HRSA's Interpretation of 42 U.S.C. § 256b(a)(4)

Defendants argue that Genesis is only challenging language contained in the audit determination, and not the guidance.[8] This assertion is patently untrue as Genesis has made clear in the Correction Action Plan related to the audit, as well in Genesis' pleadings in this matter, including its Motion for Summary Judgment, that Genesis is challenging HRSA's interpretation of 42 U.S.C. § 256b(a)(4).  Genesis has strongly asserted, and continues to assert, that HRSA did not have authority to issue any guidance that requires that compliance with § 256b(a)(5)(B) be determined by who employs the provider who wrote the patient of the entity's prescription.

---

[7] It should the focus of the 2010 Amendments was diversion through covered entities' use of contract pharmacies. 75 Fed. Reg. 43, 10273.

[8] Defendants improperly attempt to rely heavily on HRSA's "determinations" and "findings" during its audit of Genesis.  However, Defendants vacated all of its audit findings.  Here is how Defendants themselves describe its actions:

> HRSA voided the audit findings in full by letter dated June 6, 2019. A.R. 1544. That included voiding the "September 24, 2018 letter [and] accompanying revised final audit report" and the "March 20, 2019 letter approving [Genesis's] corrective action plan." The letter further explained that because "the audit findings have been voided," Genesis "has no further obligations or responsibilities in regard to the audit," including no obligation to "perform the actions outlined in the CAP previously submitted to OPA."

Dkt. No. 33-10 at 10. Thus, even though Defendants "voided the audit findings in full," throughout its Opposition Brief Defendants attempt to rely on characterizations of Genesis and "findings" and "determinations" by HRSA formed by it throughout the *voided* audit.  These "findings" and "determinations" HRSA digs out from its voided audit should be given no weight.

Genesis also argues that HRSA exceeded its authority in promulgating and enforcing, through audit mechanisms, a definition of "patient of the entity" that is far from the plain meaning of the statute.  In addition, Genesis argues that the purpose of the statutory provision at issue was to prevent covered entities from reselling or transferring 340B to non-patients and not to set forth the parameters for defining what constitutes a patient when a covered entity dispenses a 340B drug to its patients.

## IV.    Defendants' Arguments Based on the APA Have No Merit

### A.    Defendants' Argument that Genesis Does Not Have a Cause of Action Was Settled by the Fourth Circuit

Defendants contend that Genesis' Motion for Summary Judgment "does not identify a cause of action."  Defendants also contend that Genesis is raising "an APA challenge to HRSA's audit determination," rather than a declaratory judgment action.  What Defendants seem to ignore is that these two issues – whether Genesis states a cause of action in its Motion and what is the "real issue" in this case – have already been addressed by this Court in prior orders, as well as by the Fourth Circuit Court of Appeals in its Order reversing and remanding this matter.

The law is clear that a declaratory judgment action is appropriate "when there is substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality." 28 U.S.C. § 2201.  Therefore, the question a court must ask in each case is "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240-41 (1937).  The Fourth Circuit has, indeed, asked and answered this question. *Genesis Healthcare, Inc. v. Becerra*, 39 F.4th 253 (4th Cir. 2022).

17

In its Opinion remanding this matter, the Fourth Circuit recognized the suit that Genesis has filed against HRSA as an action for declaratory judgment. *Genesis Healthcare, Inc. v. Becerra*, 39 F.4th 253 (4th Cir. 2022). The Court identified that "[t]he real issue thus remains, even after HRSA's final letter, whether the 1996 Guidelines are inconsistent with the statute, as Genesis has alleged and with respect to which Genesis sought declaratory judgment." *Id*. at 261. The Court concluded that "the ongoing disagreement over how '"patient"' is to be defined in the context of the 340B Program is a *definite and concrete controversy touching the ongoing legal relations* between HRSA, as regulator of the 340B Program, and Genesis Healthcare, as a participant in the Program." *Id*. (emphasis added). Finding that the elements of a declaratory judgment action had been met, the Fourth Circuit held that this action was not moot.

This Court also recognized this matter as a declaratory judgment action. Although the Court ultimately denied Genesis's Motion to Compel Discovery in its April 23, 2023 Order, the Court noted that "the sole issue in this *declaratory judgment action* concerns the definition of 'patient' in the context of the HRSA" 340B Program, HRSA's patient definition guidelines, and whether HRSA's reading of the term "patient" is consistent with the 340B Statute, 42 U.S.C. § 256b(a)(5)(B)." ECF No. 49 at 2 (emphasis added). It is apparent that HRSA is attempting to re-litigate the issues of mootness and jurisdiction by challenging the existence of a "cause of action." Yet, both issues have been resolved by the Fourth Circuit and recognized by this Court.

**B.     Defendants' Attempt to Argue Genesis Has Not Identified an "Agency Action" Is Contrary to the Fourth Circuit's Recognition of Genesis' Satisfaction of the "Final Agency Action" Requirement**

In addition to arguing that Genesis' Motion for Summary Judgment fails to state a cause of action, Defendants argue that Genesis "does not explain in its motion what 'agency action' it is challenging; whether that agency action is 'final'; and whether or how that final agency action

does or does not pass muster under 5 USC § 706(2)." Yet, Genesis' Amended Complaint (ECF No. 31) and Motion for Summary Judgment could not be any clearer – Genesis is challenging HRSA's definition of "patient" as it relates to the 340B Program.

Genesis understands that an agency's action must be final before a court is permitted to review the agency's action under the Administrative Procedures Act ("APA"). 5 USC § 704. An "'agency action' includes the whole or part of an agency rule, order, license, section, relief, or the equivalent or denial thereof, or failure to act." 5 USC § 551(13). A final agency action must also have "determinate consequences for the party to the proceeding." *Georator v. EEOC*, 592 F.2d 765, 768 (4th Cir. 1979) (citing *ITT v. Electrical Workers*, 419 U.S. 428 (1975)). *See Bennett v. Spear*, 520 U.S. 154, 177-178 (1997) ("First, the action must mark the consummation of the agency's decision-making process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow."). However, the Fourth Circuit has already concluded that Genesis has satisfied the APA's "final agency action" requirement. *Genesis Healthcare, Inc. v. Becerra*, 39 F.4th 253 (4th Cir. 2022).

In its Opinion remanding this matter, the Court of Appeals explained that the APA "provides a cause of action to obtain judicial review" of "final agency action for which there is no other adequate remedy in a court." *Genesis Healthcare, Inc.*, 39 F.4th at 256, citing 5 U.S.C. § 704. Citing U.S. Supreme Court precedent, the Court of Appeals noted that "Genesis Healthcare's challenge to the 1996 Guidelines was also likely a challenge to a final agency action." *Genesis Healthcare, Inc.*, 39 F.4th at 262, citing *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 599-600 (2016) (explaining that the Court has long taken a pragmatic approach to finality by recognizing, for example, that an agency order that give notice of how the agency interprets the

relevant statute is a final agency action, even absent an enforcement action against a particular party).  S*ee also Eastman Kodak Co. v. Mossinghoff*, 704 F.2d 1319, 1322 (4th Cir. 1983) ("Considerations relevant to a determination of finality include whether the agency action is definitive, *whether the action has direct or immediate legal force or practical effect on the complaining party*, and whether immediate judicial review would serve efficiency or enforcement of the act under which the agency operates.")(emphasis added).

As evidenced by the record, HRSA relied on its definition of "patient" at the time of the Genesis audit and maintained this definition even after vacating the removal of Genesis from the 340B Program.  In fact, as the Fourth Circuit noted, HRSA "continued to insist that Genesis Healthcare comply with its requirement of serving only eligible 'patients,' as it had defined that term." *Genesis Healthcare, Inc.*, 39 F.4th at 256.  Thus, HRSA's interpretation of "patient" had a direct legal force on Genesis – if Genesis did not conform its practices to HRSA's definition of patient, it would continue to risk being removed from the 340B Program.

## C.     Defendants' Waiver Argument is Nonsensical and Unfounded

In a further attempt to re-argue issues that have already been addressed by the Fourth Circuit Court of Appeals, Defendants argue that Genesis has waived its statutory interpretation argument.   Defendants claim that Genesis has waived its challenge to HRSA's interpretation of the 340B Statute fails because Genesis has challenged the interpretation since the inception of this dispute. Again, as explained above, the Court of Appeals already held that Genesis has satisfied all requirements of the APA for judicial review of HRSA's definition of "patient."

In its March 13, 2018, letter to HRSA disputing the audit findings, Genesis objected to HRSA's definition of "patient" used in its 340B Drug Pricing Program Omnibus Guidance, or "Mega-Guidance," that was withdrawn in 2017.  Dkt. No. 84-3.  Genesis further argued that the

audit findings, particularly the finding relating to diversion, "speaks directly to the withdrawn mega rule/guidance." Dkt. No. 84-3. HRSA, in turn, based its disqualification of Genesis from the 340B Program in its final audit report dated June 26, 2018, on its assertion that the documentation Genesis provided was "insufficient" to show all of HRSA's patient definition criteria as met. HRSA Final Audit Report dated June 26, 2018. Dkt. 1-3. In other words, HRSA's own records demonstrate how central the patient definition dispute was to its audit of Genesis and the subsequent action filed by Genesis challenging HRSA's action which was based on HRSA's erroneous definition of the term "patient."

In support of its Motion for Preliminary Injunction, ECF No. 32, Genesis argued that HRSA was "imposing an unlawful standard based on a significant narrowing of the clear statutory language of 42 U.S.C. § 256b(a)(5)(B)." ECF No. 32 at 5. In the Amended Verified Petition, Genesis maintained that "HRSA has added to the clear terms of the statute, thus redefining the term 'patient' through informal and withdrawn guidance." ECF No. 33 at 15. As noted by the Fourth Circuit Court of Appeals, when Genesis amended its Complaint in response to HRSA's March 20, 2019, letter that Genesis must comply with its patient definition guidelines, Genesis "*maintained its challenge* to HRSA's definition of 'patient' that would continue to control its compliance with the Program."[9] *Genesis Healthcare, Inc.*, 39 F.4th at 260 (emphasis added). Thus, the record and court filings demonstrate that Genesis' argument challenging HRSA's interpretation of the statute was always central to the underlying HRSA audit and this litigation and was preserved for this Court's review.

---

[9] In addition to the numerous times Genesis raised and preserved its challenge to HRSA's definition of the term "patient," HRSA's final audit report of June 26, 2018

### D.     Defendants' Argument Concerning "Prejudicial Error" Under the APA Is Misplaced and Inapplicable

Defendants also contend that the APA's prejudicial error rule forecloses any relief to Genesis.  Specifically, Defendants argue that HRSA's misinterpretation of the 340B Statute did not affect the outcome of the audit, since HRSA's determination of Genesis' noncompliance and disqualification was based on two separate grounds.  Genesis, however, is not challenging the audit results.  HRSA voided them "in their entirety." HRSA letter dated June 6, 2019. CITE Section 5 U.S.C. § 706(2) of the APA provides that "the [reviewing] court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error."

The prejudicial error rule "is an administrative law 'harmless error rule.'  *Avail Vapor, LLC. v. F.D.A*, 55 F.4th 409 (4th Cir. 2022) (quoting *Shinseki v. Sanders*, 556 U.S. 396, 406 (2009)); *see also Sea "B" Mining Company v. Addison*, 831 F.3d 244 (4th Cir. 2016) ("Administrative adjudications are subject to the same harmless error rule that generally applies to civil cases."); and *Shinseki*, 556 U.S. at 409 ("[C]ourts have correlated review of ordinary administrative proceedings to appellate review of civil cases in this respect.").  Yet, the Supreme Court has "warned against courts determining whether an error is harmless through the use of mandatory presumptions and rigid rules rather than case-specific application of judgment, based upon examination of the record."  *Shinseki v. Sanders*, 556 U.S. 396, 407 (2009) (citing *Kotteakos v. United States*, 328 U.S. 750 (1946).  The Court has explained that "[o]ften the circumstances of the case will make clear to the...judge that the ruling, if erroneous, was harmful and nothing further need be said."  *Shinseki*, 556 U.S. at 410.

Here, Genesis is not challenging the results of HRSA's audit, or any HRSA adjudication – Genesis is seeking a declaratory judgment as to whether HRSA's interpretation of "patient" aligns with the plain language of the 340B Statute.  Therefore, the APA's prejudicial error rule does not

impact relief in this case. Even if this Court finds the prejudicial error relevant, Genesis has made it clear to the Court that HRSA's unlawful improper reading of the 340B Statute is detrimental to Genesis' and other 340B entities' ability to provide coordinated comprehensive medical care to their patients.

## V.  Defendants Cite No Legal Authority that Would Require Deference to Defendants' Interpretation of 42 U.S.C. § 256b(a)(5)(B)

Defendants argue that an agency's construction of a statute is generally entitled to deference by the courts and should only be overturned if plainly erroneous and inconsistent with the regulation. Dkt. No. 33-10 at 12. Oddly, Defendants first set aside *Chevron*, calling it "irrelevant."[10]  Dkt. No. 33-10 at 17, fn 7.

Instead, Defendants cite the *Mead* case to support their claim that their statutory interpretation is entitled to deference. *United States v. Mead Corp.,* 533 U.S. 218 (2001). In *Mead*, the Supreme Court held that ruling letters issued by Custom offices that set tariff classifications for particular imports did not qualify for *Chevron* deference, but under *Skidmore v. Swift & Co.*, 323 U.S 134 (1944), the tariff classifications are eligible for "respect." However, it is important to note that a critical component of the *Skidmore* standard is not present in this matter: statutory ambiguity. 42 U.S.C. § 256b(a)(5)(B) is not ambiguous. The plain language of the statute is clear: a covered entity cannot resell or transfer 340B drugs to anyone who is not a patient of the entity. Congress chose not to define the terms "patient", "resell" or "transfer" because they are not ambiguous terms that require definition. HRSA cannot claim to be resolving ambiguity or filling a gap in this very straightforward statutory provision.

---

[10] For reference, Genesis' *Chevron* analysis can be found in Genesis' Memorandum in Support of Summary Judgment. Dkt. No. 100 at 13-15.

HRSA is instead trying to add requirements to the definition of patient – *that Congress rejected in 1992* - without any authority or justification for doing so. Specifically, the Defendants' 1996 Guidelines, as applied in the Final Audit Report, adopt the prescription-patient connection that *Congress rejected*. *See Section II.C.* If the statutory text were not clear enough on its own, Congress's choice *not* to require such a connection is meaningful evidence that the Defendants erred in looking for and requiring Genesis to demonstrate that it prescribed a drug to a person as a condition of determining them to be its "patient." For these reasons, Defendants have not shown that their interpretation of 42 U.S.C. § 256b(a)(5)(B) merits deference.

## VI.  HRSA's Interpretation of the Term "Patient" is Also Not Entitled to Deference Pursuant to the Major Questions Doctrine

Defendants' argument that it should be accorded deference also fails in light of the "major questions" doctrine. In 2022, the U.S. Supreme Court established the "major questions" doctrine. *West Virginia v. E.P.A.*, 142 S. Ct. 2587 (2022). The issue in *West Virginia* concerned whether the EPA could force a national industry to change its operations, by eliminating the use of coal-fired power plants, utilizing the EPA's regulatory authority over point-source air polluters. *Id*. at 2600. The Supreme Court held that in order for the EPA to impose these restrictions, the EPA must demonstrate "clear congressional authorization" on account of the "history and the breadth of the authority that the agency ha[d] asserted, and the economic and political significance of that assertion." *Id*. at 2616. Applying this framework, the Supreme Court concluded that the EPA failed to demonstrate such authorization, and struck down the regulatory scheme. *Id*. at 2615.

Following West Virginia, a recent Fourth Circuit case applied the "major questions" doctrine in deciding whether the Fisheries Reform Group interpretation of the Clean Water Act ("CWA") to require permits for shrimp trawlers to return bycatch to the ocean was proper.

*North Carolina Coastal Fisheries Reform Group v. Capt. Gaston LLC*, 2023 WL 5009246. Rather than rely on the parties' interpretation of the CWA's definitions, the Fourth Circuit, relying on *West Virginia v. EPA*, required the agency to demonstrate "clear authorization from Congress" to require permits for shrimp trawlers' normal activity. *Id*. at 6-7.

Applying the major questions doctrine to this case, HRSA cannot show specific Congressional authorization to expand and amend the meaning of 42 U.S.C. § 256b(a)(5)(B) to require a patient of a covered entity to obtain a prescription from the covered entity in order to receive a 340B medication from a covered entity.  In fact, as explained in Section II.C., Congress specifically rejected this concept in 1992.  The enforcement of HRSA's embellished interpretation of 42 U.S.C. § 256b(a)(5)(B) would have extensive economic consequences to patients who would be deprived of access to affordable medications and to covered entities. In other words, the purpose of the 340B Program, to enable covered entities to pass on drug savings to their low-income patients, would be thwarted.  Congress intended, instead, to protect *access* of Americans to needed medications and life-threatening therapies.

## VII.    *Amici* Omit Significant Legislative History

*Amici* provides this court with a distorted and inaccurate analysis of 340B's legislative history by omitting significant portions of the legislative history and cherry picking language from other sections. Most significantly, and as explained above, Amici fail to inform this Court that legislative history reflects that Congress *rejected* an effort to amend the language of the 340B Statute to limit 340B priced drugs to patients who received their prescriptions from an employed or contracted provider of the 340B entity. *See* Section II.C. This fact alone conclusively establishes that HRSA and big Pharma's attempt to rewrite the definition of patient to include a prescription

element must be rejected. Congress intended to preserve patient access to 340B medications, not restrict it. *Id.*

*Amici* also omit key language from the 1992 House Report explaining that the purpose of the 340B Drug Pricing Program "is to enable the Department of Veterans Affairs and certain Federally-funded clinics to obtain lower prices on the drugs that they provide *to their patients*." H.R. Report 102-384, Part 2 at7 (1992)(**Exhibit 2**), and that the "340B Program" has proven to be a critical tool *for covered entities* to "stretch scarce Federal resources as far as possible, reaching more eligible patients and providing more comprehensive services," *Id*. at 12. The purpose of the 340B Program is not limited to making drugs more affordable to a certain limited class of indigent and uninsured patients as argued by *Amici*. Rather, Congress has clearly stated that the purpose is to reduce the cost of drugs to covered entities such as Genesis to allow covered entities to reach more eligible patients and provide more comprehensive services.

Moreover, the 340B Statute does not even address the issue which Amici and Pharma are most upset about, the amount of money covered entities receive from Medicare, Medicaid and commercial payors in reimbursement payments for these prescription medications. Simply put, 340B imposes a ceiling price on the costs of the drugs to the VA and other Federally-funded clinics. 340B does not regulate reimbursement payments to these covered entities for the dispensing of these same drugs.

## VIII.   Consideration of Legal Issues or Arguments Raised Solely by the Proposed *Amici* Is Not Permitted

The proposed *amicus* brief of Janssen Pharmaceutical Companies ("Janssen") argues Plaintiff's action should be dismissed based on the statute of limitations – an affirmative legal defense that has not been raised by the Defendants in their summary judgment briefings. ECF 107-1 at 13-15. It is well-established that "a court may not consider legal issues or arguments not

raised by the parties." *Tafas v. Dudas*, 511 F.Supp.2d 652, 661 (E.D.Va. 2007) (citing *Cellnet Communs. v. FCC*, 149 F.3d 429, 443 (6th Cir.1998) (holding that "[t]o the extent that the amicus raises issues or make arguments that exceed those properly raised by the parties, [the Court] may not consider such issues")).   Defendants have not asserted the statute of limitations in their summary judgment memorandum, and therefore, Janssen's argument related to the same may not be considered by the Court.

## IX.  Amici Should be Judicially Estopped from Arguing that HRSA Has the Authority to Enforce Interpretative Guidance under the 340B Program

*Amici*, other manufacturers, and their trade organization acting on their behalf, have engaged in coordinated litigation to hamstring the Secretary's ability to administer the 340B Program and enforce its requirements against them.   For instance, in 2013, the Secretary promulgated a regulation relating to the orphan drug exclusion under the 340B Statute.  Final Rule, Exclusion of Orphan Drugs for Certain Covered Entities under 340B Program, 78 Fed. Reg. 44,016, 44,017 (July 23, 2013).   Pharmaceutical Research and Manufacturers of America ("PhRMA"), on behalf of itself and its members, sued the Secretary under the Administrative Procedure Act*, arguing that he lacked statutory authority to promulgate the rule. Compl. for Decl. & Inj. Relief*, D.D.C. Case No. 13-cv-01501-RC, Dkt. No. 1, *4 (Sep. 27, 2013) (hereinafter "PhRMA 1 Complaint").   The D.C. District Court agreed, and it vacated the final rule on those grounds.  *See Order*, D.D.C. Case No. 13-cv-01501-RC, Dkt. No. 55, *1 (Aug. 27, 2014).

When the Secretary then published the vacated rule as interpretative guidance, PhRMA—on behalf of itself and its members—sued again.  *Compl. for Decl. & Inj. Relief*, D.D.C. Case No. 14-cv-1685-RC, Dkt. No. 1, *6 (Oct. 9, 2014) (hereinafter "PhRMA 2 Complaint").  It argued that, even when published as interpretative guidance, the orphan drug rule was invalid because of "the agency's lack of legislative authority to regulate the scope of the statutory orphan drug exclusion."

*Id.* at 5.  The D.C. District Court again agreed, and it vacated the interpretative rule.  *PhRMA v. Dep't of Health & Human Servs.*, 138 F.Supp.3d 31 (D.D.C. 2015).

Each of the proposed *amici* was, at the time of the *PhRMA* decisions, a member of PhRMA. *Compare* website of Pharmaceutical Research & Manufacturers of America, *Member Companies* (Sept. 4, 2013) (archived at https://web.archive.org/web/20130904153227/ http://www.phrma.org/about/member-companies) *with* website of Pharmaceutical Research & Manufacturers of America, *Member Companies* (Nov.3,2015)(archived at https://web.archive.org/web/20130904153227/http://www.phrma.org/about/member-companies). Because the proposed *amici* have successfully sued to stop the Secretary from enforcing his interpretation of the 340B Statute against them, the Court should reject their guileful attempt to support the Secretary in enforcing his interpretation of the 340B Statute against Genesis. Judicial estoppel is an appropriate equitable vehicle for such an order.

Judicial estoppel is an equitable doctrine that a court may invoke at its discretion.  *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001).  Its purpose is "to protect the integrity of the judicial process[] by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *Id.* (internal quotation marks and citations omitted).  Judicial estoppel may be invoked where a party's later position is clearly inconsistent with its earlier position; where the party succeeded in persuading a court to accept the party's earlier position; and where the party would derive an unfair advantage or impose an unfair detriment on an opposing party if not estopped.  *Id.* at 750-51.  Judicial estoppel is most frequently applied to a party's factual contentions, *see id.*, and the Fourth Circuit will "generally require" that a party asserting estoppel establish that the position is a factual rather than legal one, *1000 Friends of Maryland v. Browner*, 265 F.3d 216, 226-27 (4th Cir. 2001) (*citing Lowery v. Stovall,* 92 F.3d 219, 224 (4th Cir. 1996)).

However, this limited interpretation arose before *New Hampshire*, and the Supreme Court has indicated that *New Hampshire* may apply where a party changes legal positions during the course of litigation. *Sorrel v. IMS Health*, 564 U.S. 552, 563 (2011). The Court's application of *New Hampshire* to drug manufacturers—serial litigants who frequently, and successfully, sue to limit the Secretary's ability to interpret, administer, and enforce the 340B Statute—would be consistent with the purpose of judicial estoppel and, moreover, fundamentally equitable.

The Court is justified in barring the proposed *amici's* assertions under *New Hampshire* because the interpretation of the 340B Statute put forward in their briefs is fundamentally inconsistent with the position they took in *PhRMA 1* and *PhRMA 2*. Indeed, these manufacturers and their ostensible competitors have a long history of engaging in coordinated, strategic litigation to limit the Secretary's ability to administer, interpret, and enforce the 340B Statute.

As the Court is aware, *see* April 24 Order, these manufacturers and their economic competitors have openly flouted HRSA's longstanding guidance regarding 340B contract pharmacy arrangements. When HRSA sent three proposed *amici* letters—which it did not have the authority to enforce—telling them that their contract pharmacy restrictions violated the plain language of the 340B Statute, *see* HRSA.gov, *Program Integrity* (https://www.hrsa.gov/opa/program-integrity) (last accessed Aug. 18, 2023) (displaying letters to AbbVie, Merck, and Eli Lilly), two of them sued, and the third simply ignored HRSA and continued restricting contract pharmacy shipments. Then, when three other manufacturers successfully convinced the Third Circuit that the Secretary cannot interpret the 340B Statute to require contract pharmacy shipments, proposed *amicus* Janssen was the first manufacturer to further restrict its contract pharmacy practices. Johnson & Johnson Health Care Systems, Inc.,

*Notice to 340B and Non-340B End Customers Regarding Updates to 340B Delivery Limitations* (Feb. 15, 2023), j-j-notice-refunds-340b-covered-entities.pdf (hrsa.gov).

The rationale supporting each of the manufacturers' claims in *PhRMA 1*, *PhRMA 2*, and the contract pharmacy cases, is that the Secretary is not authorized to authoritatively interpret the 340B Statute through rulemaking or guidance. Yet here, when Genesis asserts the same position, drug manufacturers object. This contradictory and arguably cynical imposition into this case should be rejected.

## I.  <u>CONCLUSION</u>

For the foregoing reasons, Genesis respectfully requests that this Court rule that Genesis is entitled to Summary Judgment with respect its claims as set forth in its Amended Verified Petition for Judicial Review that stem from the plain language of 42 U.S.C. § 256b(a)(5)(B).

MAYNARD NEXSEN PC

By: <u>s/Alice V. Harris</u>
Alice V. Harris, Fed. ID #6044
Maynard Nexsen PC
1230 Main Street, Suite 700 (29201)
Post Office Box 2426
Columbia, SC 29202
Tel: 803-253-8284
Email: AHarris@maynardnexsen.com

GRIFFIN HUMPHRIES LLC
James M. Griffin (Fed. I.D. 1053)
Margaret N. Fox (Fed. I.D. 10576)
4408 Forest Drive, Suite 300
P.O. Box 999 (29202)
Columbia, South Carolina 29206
Telephone: 803-744-0800
jgriffin@griffinhumphries.com
mfox@griffinhumphries.com

*Attorneys for Plaintiff Genesis Healthcare Inc.*

Date:  September 15, 2023